ORAL ARGUMENT NOT YET SCHEDULED

No. 14-5305
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

MINGO LOGAN COAL COMPANY,

*Plaintiff-Appellant,*

-v.-

ENVIRONMENTAL PROTECTION AGENCY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA
Case No. 1:10-cv-00541 (Hon. Amy Berman Jackson)

**PAGE-PROOF BRIEF OF DEFENDANT-APPELLEE**

Of Counsel:

KARYN I. WENDELOWSKI
STEFANIA D. SHAMET
  United States Environmental
  Protection Agency

ANN D. NAVARO
  Assistant Chief Counsel for
  Litigation
  United States Army Corps
  of Engineers

JOHN C. CRUDEN
  Assistant Attorney General

AARON P. AVILA
MARK R. HAAG
CYNTHIA J. MORRIS
KENNETH C. AMADITZ
MATTHEW LITTLETON
  Attorneys, Environment & Natural
  Resources Division
  United States Department of Justice
  P.O. Box 7415
  Washington, DC 20044
  (202) 514-4010
  matthew.littleton@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and amici.** Plaintiff is Mingo Logan Coal Company and Defendant is the U.S. Environmental Protection Agency. There are no intervenors. The amici listed below participated in the district court and/or participated in a previous appeal in this action.

Alabama Mining Association

Alaska Mining Association

American Farm Bureau Federation

American Road and Transportation Builders Association

Arizona Mining Association

Association of American Railroads

Chamber of Commerce of the United States of America

Coal Operators & Associates, Inc.

Coal River Mountain Watch

Colorado Mining Association

Fertilizer Institute

Foundation for Environmental and Economic Progress

Huffman, Randy C., on behalf of the State of West Virginia in his official capacity as Cabinet Secretary of the West Virginia Department of Environmental Protection

C-1

Idaho Mining Association

Illinois Coal Association

Indiana Coal Council, Inc.

Industrial Minerals Association – North America

Kentucky Coal Association

Montana Coal Council

National Association of Home Builders

National Association of Manufacturers

National Council of Coal Lessors, Inc.

National Mining Association

National Stone, Sand and Gravel Association

Natural Resources Defense Council

New Mexico Mining Association

Northwest Mining Association

Ohio Coal Association

Ohio Valley Environmental Coalition

Pennsylvania Coal Association

Sierra Club

Tennessee Mining Association

United Company

Utah Mining Association

Utility Water Act Group

Virginia Coal Association

West Virginia Coal Association

West Virginia Highlands Conservancy

Western Business Roundtable

Wyoming Mining Association

**B. Ruling under review.** On September 30, 2014, the Honorable Amy Berman Jackson issued an opinion and final order granting summary judgment to the U.S. Environmental Protection Agency on all outstanding claims. *Mingo Logan Coal Co., Inc. v. U.S. Envtl. Prot. Agency*, 70 F. Supp. 3d 151 (D.D.C. 2014) (Dkt. 106 & 107).

**C. Related cases**. This case was previously before this Court as Case No. 12-5150, in which the district court's judgment was reversed and remanded for further proceedings. *Mingo Logan Coal Co. v. U.S. Envtl. Prot. Agency*, 714 F.3d 608 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 1540 (2014). Participating amici have challenged U.S. Department of the Army Permit No. 199800436-3 (Section 10: Coal River), which is

relevant to this case. *See Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, S.D.W. Va. No. 3:05-cv-00784, Dkt. 318 (4th Supp. Compl. filed June 19, 2007). Mingo Logan Coal Company intervened in that action to defend the decision of the U.S. Army Corps of Engineers.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES ....................................................... C-1

TABLE OF CONTENTS.............................................................i

TABLE OF AUTHORITIES ....................................................iii

GLOSSARY ............................................................................ x

STATEMENT OF JURISDICTION....................................... 1

STATEMENT OF ISSUES .................................................... 1

STATEMENT OF THE CASE ............................................... 2

   A.  Pollutant discharge permits under the Clean Water Act .............. 2

   B.  The Spruce Permit and the EPA's Final Determination ............... 7

   C.  Procedural history ........................................................ 10

STANDARD OF REVIEW .................................................. 16

SUMMARY OF ARGUMENT ............................................. 19

ARGUMENT ...................................................................... 21

   I.  The EPA can premise a Section 404(c) determination on an
      "unacceptable adverse effect" on wildlife downstream of the
      footprint of the fill ....................................................... 21

      A.  The EPA's interpretation of Section 404(c) is entitled to
         *Chevron* deference ................................................. 22

      B.  The EPA reasonably interprets Section 404(c) to allow for
         consideration of downstream effects on wildlife ................... 24

      C.  The EPA's consideration of downstream effects under
         Section 404(c) does not supplant or interfere with State-
         issued NPDES permits or water quality standards ............... 28

II.  The EPA's finding that an unacceptable adverse effect on wildlife would occur within the footprint of the fill was supported by substantial evidence, including substantial new information that came to light after permit issuance..........33

    A.  Mingo Logan's challenge to the "downstream" finding merely restates the statutory argument refuted in Part I ....33

    B.  The EPA's action is not subject to "heightened scrutiny."......34

    C.  Substantial evidence supported the EPA's finding that the fill discharge would have an unacceptable adverse effect on wildlife within the footprint of the fill..............................40

III. Mingo Logan's reliance/compliance claim is forfeited, and it also lacks merit................................................................46

    A.  Mingo Logan has forfeited this claim by not raising it before the EPA or the district court .......................................47

    B.  Section 404(c) does not require the EPA to address reliance interests or permit compliance history....................50

    C.  The APA did not require the EPA to address compliance history or reliance interests in this case ...............................55

CONCLUSION ....................................................................59

STATUTORY AND REGULATORY ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*AEP Texas North Co. v. Surface Transportation Board*,
   609 F.3d 432 (D.C. Cir. 2010) ............................................................. 50

*Alliance to Save the Mattaponi v. U.S. Army Corps of Engineers*,
   515 F. Supp. 2d 1 (D.D.C. 2007) ........................................................ 39

*American Horse Protection Ass'n, Inc. v. Lyng*,
   812 F.2d 1 (D.C. Cir. 1987) ................................................................. 37

*Auer v. Robbins*,
   519 U.S. 452 (1997) ............................................................................. 16

*Center for Biological Diversity v. EPA*,
   749 F.3d 1079 (D.C. Cir. 2014) .......................................................... 18

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S. 837 (1984) ............................................................................. 16

*Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*,
   557 U.S. 261 (2009) .................................................................. 3, 29, 30

*CSX Transportation, Inc. v. Alabama Department of Revenue*,
   562 U.S. 277 (2011) ............................................................................. 54

*CTS Corp. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014) .............................................................. 33

*Dickinson v. Zurko*,
   527 U.S. 150 (1999) ............................................................................. 18

*District Hospital Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015) .............................................................. 37

---

\*   Authorities upon which we chiefly rely are marked with asterisks.

*E.I. du Pont de Nemours & Co. v. Train*,
    430 U.S. 112 (1977) ................................................................53

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009) ...............................................................16

*Ethyl Corp. v. EPA*,
    541 F.2d 1 (D.C. Cir. 1976) .............................................17

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .......... 32, 34, 35, 36, 37, 38, 39, 40, 45, 46, 56, 57

*Flynn v. Commissioner*,
    269 F.3d 1064 (D.C. Cir. 2001) ....................................47, 49

*Geier v. American Honda Motor Co.*,
    529 U.S. 861 (2000) ...............................................................32

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...............................................................37

*Huls America, Inc. v. Browner*,
    83 F.3d 445 (D.C. Cir. 1996) ...........................................18

*James City Cty., Va. v. EPA*,
    12 F.3d 1330 (4th Cir. 1993) (*James City*) ................. 6, 24, 25, 51, 57

*Judulang v. Holder*,
    132 S. Ct. 476 (2011) ............................................................17

*Marsh v. Oregon Natural Resources Council*,
    490 U.S. 360 (1989) ..........................................................45, 59

*Mayo Foundation for Medical Education & Research v. United States*,
    562 U.S. 44, 57 (2011) .........................................................23

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ......................................................50, 55

iv

*Mingo Logan Coal Co. v. EPA,*
    134 S. Ct. 1540 (2014) ................................................................. 12

*Mingo Logan Coal Co. v. EPA,*
    714 F.3d 608 (D.C. Cir. 2013)
    (*Mingo Logan II*) ..............................5, 6, 12, 16, 26, 51, 52, 53, 56, 57

*Mingo Logan Coal Co., Inc. v. EPA,*
    850 F. Supp. 2d 133 (D.D.C. 2012) (*Mingo Logan I*) ........................ 11

*Mingo Logan Coal Co. v. EPA,*
    70 F. Supp. 3d 151 (D.D.C. 2014)
    (*Mingo Logan III*) .......... 7, 13, 14, 15, 16, 22, 25, 26, 27, 28, 29, 30, 33
                            34, 36, 37, 39, 40, 41, 42, 43, 45, 48, 52

*Mobil Communications Corp. v. FCC,*
    77 F.3d 1399 (1996) ...................................................................... 57

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual
    Automobile Insurance Co.,*
    463 U.S. 29 (1983) (*State Farm*) ..................................... 17, 18, 35, 46

*National Ass'n of Broadcasters v. FCC,*
    569 F.3d 416 (D.C. Cir. 2009) ........................................................ 40

*National Ass'n of Regulatory Utility Commissioners v. ICC,*
    41 F.3d 727 (D.C. Cir. 1994) ......................................................... 18

*National Wildlife Federation v. EPA,*
    286 F.3d 554 (D.C. Cir. 2002) ........................................................ 47

*NLRB v. Bell Aerospace Co. Division of Textron Inc.,*
    416 U.S. 267 (1974) .................................................................. 52, 56

*Norton v. Southen Utah Wilderness Alliance,*
    542 U.S. 554 (2004) ...................................................................... 38

*NRDC, Inc. v. EPA,*
    859 F.2d 156 (D.C. Cir. 1988) ........................................................ 23

*Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*,
   S.D.W. Va. Case No. 3:05-cv-00784 ....................................................8

*Sims v. Apfel*,
   530 U.S. 103 (2000) ....................................................48

*Smiley v. Citibank (South Dakota), N.A.*,
   517 U.S. 735 (1996) ....................................................37, 38, 56

*Smith v. City of Jackson, Mississippi*,
   544 U.S. 228 (2005) ....................................................25

*Stern v. Marshall*,
   131 S. Ct. 2594 (2011) ....................................................18

*Students Against Genocide v. Department of State*,
   257 F.3d 828 (D.C. Cir. 2001) ....................................................34

*United States v. Pennsylvania Industrial Chemical Corp.*,
   411 U.S. 655 (1973) ....................................................56

*United States v. Rands*,
   389 U.S. 121 (1967) ....................................................57

*Verizon v. FCC*,
   740 F.3d 623 (D.C. Cir. 2014) ....................................................18

*Village of Barrington, Illinois v. Surface Transportation Board*,
   636 F.3d 650 (D.C. Cir. 2011) ....................................................47

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ....................................................51

*Williams Natural Gas Co. v. FERC*,
   3 F.3d 1544 (D.C. Cir. 1993) ....................................................50

## Statutes and Public Laws

5 U.S.C. § 701(a)(2) ..................................................................... 37

5 U.S.C. § 706 .................................................................... 34, 59

5 U.S.C. § 706(2)(A) .............................................................. 11, 17

5 U.S.C. § 706(2)(C) ................................................................ 11

33 U.S.C. § 1251(a) ................................................................... 2

33 U.S.C. § 1251(d) ................................................................. 23

33 U.S.C. § 1311(a) ................................................................... 2

33 U.S.C. § 1313 ................................................................ 15, 30

33 U.S.C. § 1316 .................................................................... 30

33 U.S.C. § 1341(a) ................................................................. 30

33 U.S.C. § 1342 ..................................................................... 3

33 U.S.C. § 1342(k) ................................................................. 53

33 U.S.C. § 1343(c) ................................................................... 3

33 U.S.C. § 1343(c)(1)(B) ........................................................ 26

33 U.S.C. § 1344 ..................................................................... 2

33 U.S.C. § 1344(a) ................................................................... 3

33 U.S.C. § 1344(b) .................................................................. 4

33 U.S.C. § 1344(b)(1) ......................................................... 3, 26

33 U.S.C. § 1344(b)(2) ......................................................... 3, 51

*33 U.S.C. § 1344(c) ................................. 1, 4, 12, 23, 24, 25, 30, 50, 53

33 U.S.C. § 1344(h)(1)(A)(iii)(III) ................................................. 39

33 U.S.C. § 1344(p) ................................................. 6, 12, 52

33 U.S.C. § 1361(a) ................................................. 23

33 U.S.C. § 1362(6) ................................................. 7

33 U.S.C. § 1362(7) ................................................. 2

33 U.S.C. § 1370 ................................................. 30

33 U.S.C. § 1402(b) ................................................. 25

33 U.S.C. § 1413(d) ................................................. 25

33 U.S.C. § 403 ................................................. 4

33 U.S.C. § 1344(n) ................................................. 56

Marine Protection, Research and Sanctuaries Act of 1972,
    Pub. L. No. 92-532, 86 Stat. 1052 ................................................. 25

## Rules and Regulations

33 C.F.R. § 122.4 ................................................. 30

33 C.F.R. § 320.2 ................................................. 54

33 C.F.R. § 323.2(e)(1)(i) ................................................. 7

33 C.F.R. § 325.1 ................................................. 54

33 C.F.R. § 325.7 ................................................. 7, 54

33 C.F.R. § 325.7(a) ................................................. 40

33 C.F.R. § 320.4(g) ................................................. 57

40 C.F.R. § 131.21(d) ................................................. 30

40 C.F.R. part 230 ........................................................................3

40 C.F.R. § 230.10(b)...................................................................30

40 C.F.R. § 230.10(c)...................................................................27

40 C.F.R. § 230.11(h)...................................................................27

*40 C.F.R. § 231.2(e)........................................... 5, 26, 27, 41, 54

40 C.F.R. § 231.3 ...........................................................................8

40 C.F.R. § 231.6...................................................................11, 38

## Federal Register Notices

*Denial or Restriction of Disposal Sites; Section 404(c) Procedures,
    44 Fed. Reg. 58,076 (Oct. 9, 1979)
    (Section 404(c) Procedures) ........................... 5, 6, 26, 41, 42

National Pollutant Discharge Elimination System; Revision of
    Regulations,
    44 Fed. Reg. 32,854 (June 7, 1979)....................................53

## Congressional Documents

118 Cong. Rec. 33,692 (1972) ............................................5, 53

H.R. 11,896, 92d Cong., § 2
    (as reported by H. Comm. on Pub. Works Mar. 11, 1972) .................4

H.R. Rep. No. 911,
    92d Cong., 2d Sess. (1972) .........................................4, 53

S. 2770, 92d Cong., § 2,
    117 Cong. Rec. 38,884 (as passed Nov. 2, 1971)...................4

# GLOSSARY

| | |
|---|---|
| 404(b)(1) Guidelines | 40 C.F.R. part 230 |
| APA | Administrative Procedure Act |
| Corps | United States Army Corps of Engineers |
| EPA | United States Environmental Protection Agency |
| Final Determination | Final Determination of U.S. Environmental Protection Agency Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia |
| JA | Joint Appendix |
| Mingo Br. | Principal brief of Plaintiff-Appellant |
| Mingo Logan | Mingo Logan Coal Company |
| NPDES | National Pollutant Discharge Elimination System |
| Spruce Permit | U.S. Department of the Army Permit No. 199800436-3 (Section 10: Coal River) |

## STATEMENT OF JURISDICTION

The U.S. Environmental Protection Agency ("EPA") agrees with the jurisdictional statement of Mingo Logan Coal Company ("Mingo Logan"). Mingo Logan Brief ("Mingo Br.") at 4.

## STATEMENT OF ISSUES

Section 404(c) of the Clean Water Act ("Act") authorizes the EPA to "withdraw[]" the specification of "any" disposal site for dredged or fill material that is designated in a permit issued by the U.S. Army Corps of Engineers ("Corps"). 33 U.S.C. § 1344(c). The EPA can act "whenever [it] determines … that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas …, wildlife, or recreational areas." *Ibid.* In this case, the EPA withdrew the specifications of some (but not all) disposal sites designated in a Corps permit issued to Mingo Logan. In 2013, this Court confirmed the EPA's authority to take that step, and on remand, the district court rejected the company's other claims.

Mingo Logan raises three issues. Affirmance on the first issue will obviate the need to address the second issue, and vice versa. This Court should not entertain the third issue because Mingo Logan forfeited it.

1.  Can the EPA base a Section 404(c) decision on an unacceptable adverse effect downstream of the disposal site? [Mingo Br. 48–58]

2.  Did the EPA adequately explain its factual conclusion that the fill material proposed for discharge would have an unacceptable adverse effect on wildlife in the 6.6-mile footprint of the fill? [Mingo Br. 32–47]

3.  Did the EPA have to address Mingo Logan's compliance record or the company's unsupported allegation that it made substantial post-permit investments in reliance on the ability to discharge fill material into disposal sites withdrawn under Section 404(c)? [Mingo Br. 18–32]

## STATEMENT OF THE CASE

### A.  Pollutant discharge permits under the Clean Water Act

Congress passed the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act prohibits the "discharge of any pollutant" into navigable waters except in accordance with its terms. *Id.* § 1311(a); *see also id.* § 1362(7) (defining "navigable waters"). The Act establishes two categories of permits for discharging pollutants: Section 404 authorizes the Corps and qualified States to issue permits allowing the discharge of "dredged or fill material," *id.* § 1344, and Section 402 authorizes the

EPA and qualified States to issue permits allowing the discharge of other pollutants, *id.* § 1342. Section 402 permits are generally known as National Pollutant Discharge Elimination System ("NPDES") permits. The two permit programs are mutually exclusive: "[I]f the Corps has authority to issue a permit for a discharge under § 404, then the EPA lacks authority to do so under § 402." *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 274 (2009).

Section 404 allows the Corps (or qualified State) to issue permits for "the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The Corps follows the 404(b)(1) Guidelines (codified at 40 C.F.R. part 230), which are "based upon criteria" like those that the EPA uses when issuing NPDES ocean-discharge permits. *Id.* § 1344(b)(1) (referencing 33 U.S.C. § 1343(c)). If the 404(b)(1) Guidelines alone would prohibit specification of a disposal site, the Corps may still specify the disposal site based on "the economic impact of the site on navigation and anchorage." *Id.* § 1344(b)(2).

Section 404(c) authorizes the EPA to "prohibit," "deny," "restrict," or "withdraw[]" the specification of "any" disposal site "whenever [the EPA Administrator] determines, after notice and opportunity for public

hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas …, wildlife, or recreational areas."[1] 33 U.S.C. § 1344(b)–(c). That unusual power stems from a legislative compromise.

The Senate would have given the EPA authority to issue permits for the discharge of *any* pollutant, S. 2770, 92d Cong., § 2, 117 Cong. Rec. 38,884 (as passed Nov. 2, 1971) (proposed Section 402(m)), while the House of Representatives would have allowed the Corps to retain its traditional authority to issue dredge-and-fill discharge permits, H.R. 11,896, 92d Cong., § 2 (as reported by H. Comm. on Pub. Works Mar. 11, 1972); H.R. Rep. No. 911, 92d Cong., 2d Sess., at 52 (1972) (proposed Section 404) . In the end, Congress allowed the Corps to issue dredge-and-fill permits but also "granted EPA a broad environmental 'backstop' authority over … discharge site selection." *Mingo Logan Coal Co. v.*

---

[1]     The statute also authorizes the EPA to prohibit or withdraw "*the use of* any defined area for specification." 33 U.S.C. § 1344(c) (emphasis added). That phrase gives the EPA power to deny, restrict, or withdraw specification of a disposal site for a specific discharge type or volume. In this case, the EPA withdrew some of the specifications of disposal sites in the Corps permit and also prohibited their specification "for use as a disposal site associated with future surface coal mining that would be expected to result in a nature and scale of [similar impacts]." AR10108.

*EPA*, 714 F.3d 608, 612 (D.C. Cir. 2013) (*Mingo Logan II*); *see also* 118 Cong. Rec. 33,692, 33,699 (1972) ("[T]he [Conference] Committee did not believe there could be any justification for permitting the [Corps] to make determination [*sic*] as to the environmental implications of either the site to be selected or the specific spoil to be disposed of in a site.").

The EPA issued regulations in 1979 that govern the exercise of its Section 404(c) authority. *Denial or Restriction of Disposal Sites; Section 404(c) Procedures*, 44 Fed. Reg. 58,076 (Oct. 9, 1979) (*Section 404(c) Procedures*). The regulations define an "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies … or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e). The preamble to the regulations explains that because the statute "refers only to environmental factors," the EPA does not have to balance "environmental benefits against non-environmental costs." *Section 404(c) Procedures*, 44 Fed. Reg. at 58,078.

The preamble stresses that "[t]he statute on its face clearly allows EPA to act after the Corps has issued a permit," 44 Fed. Reg. at 58,077, and the EPA "has consistently maintained this interpretation for over

thirty years," *Mingo Logan II*, 714 F.3d at 613 n.3. Neither the statute nor the EPA's regulations "restrict the EPA's right to act after a permit has been issued." *Section 404(c) Procedures*, 44 Fed. Reg. at 58,077. The EPA, however, has exercised that authority sparingly; in 43 years since the Act's passage, the agency has acted only three times after a permit issued—in 1981, in 1992, and in this case. *See Mingo Logan II*, 714 F.3d at 613 n.3; *James City Cty., Va. v. EPA*, 12 F.3d 1330 (4th Cir. 1993) (*James City*) (upholding the EPA's post-permit determination). From the start, the agency recognized that among "the most likely occasions necessitating 404(c) action after issuance" were cases where it learned of "new scientific discoveries" or other "new information" only after the permit had issued. *Section 404(c) Procedures*, 44 Fed. Reg. at 58,077.

If the EPA withdraws specifications of disposal sites designated in a fill permit, the permit is "in effect amended so that discharges at the previously specified disposal sites are no longer in '[c]ompliance with' the permit—although the permit itself remains in effect to the extent it is usable." *Mingo Logan II*, 714 F.3d at 615. The EPA's action does not retroactively render earlier discharges unlawful if they were made in compliance with the permit. *Id.* at 615 n.5; *see also* 33 U.S.C. § 1344(p).

## B.  The Spruce Permit and the EPA's Final Determination

Mingo Logan's Section 404 permit ("Spruce Permit") authorized it to place fill material from operations associated with the Spruce No. 1 coal mine into 7.5 miles of West Virginia streams. *Mingo Logan Coal Co. v. EPA*, 70 F. Supp. 3d 151, 157, 159 (D.D.C. 2014) (*Mingo Logan III*); *see generally* 33 U.S.C. § 1362(6) (listing "rock" as a "pollutant"); 33 C.F.R. § 323.2(e)(1)(i) (defining "fill material"). The permit specified 37 disposal sites within Seng Camp Creek, Pigeonroost Branch, Oldhouse Branch, and their tributaries. AR25767–68. The permit "does not grant any property rights" to Mingo Logan, and the Corps may rescind it "at any time the circumstances warrant," such as when "[s]ignificant new information surfaces." AR25764–65; *see* 33 C.F.R. § 325.7.

The Spruce No. 1 coal mine is among the largest individual surface mines ever authorized in Appalachia. AR10117. While the EPA raised several environmental concerns during the Section 404 permit review process, the agency did not act under Section 404(c) before the Corps issued the Spruce Permit on January 22, 2007. *Mingo Logan III*, 70 F. Supp. 3d at 158–59. A week after the permit issued, it was challenged in an ongoing lawsuit. *See Ohio Valley Envtl. Coal. v. U.S. Army Corps*

*of Eng'rs*, S.D.W. Va. Case No. 3:05-cv-00784, Dkt. 250 (Jan. 30, 2007)
(motion to file amended complaint). Ten days after the Corps issued the
Spruce Permit, Mingo Logan volunteered to restrict its activities to the
Seng Camp Creek disposal sites unless and until the company provided
the plaintiffs with advance notice. *Id.*, Dkt. 257 (Feb. 1, 2007) (order
denying injunctive relief); AR10121. In the years that followed, Mingo
Logan never gave notice that it planned to discharge any fill material
into Pigeonroost Branch, Oldhouse Branch, or their tributaries.

On September 3, 2009, the EPA's Acting Regional Administrator
asked his counterpart at the Corps, the District Engineer, to revisit the
Spruce Permit due to "new information and circumstances." AR12754–
56. The District Engineer replied that "no factors currently compel me
to consider permit suspension, modification or revocation." AR12781–
84. The EPA then initiated the Section 404(c) process by proposing to
withdraw or restrict the use of all disposal sites specified in the permit
to avoid unacceptable adverse effects on wildlife and fisheries. AR4–49;
*see* 40 C.F.R. § 231.3. The EPA invited public comment on a variety of
topics, including whether there were "techniques … by which impacts
from this project … may be reduced to an acceptable level." AR49.

8

Eighty individuals commented on the proposal at a public hearing, AR152–56, and the EPA received more than 50,000 written comments, AR10111, including 258 pages of comments submitted by Mingo Logan, AR8047–53, 10662–66. The EPA also met with Mingo Logan's parent company, Arch Coal, to discuss the EPA's proposal and explore possible corrective actions to limit environmental impacts. AR10125. The EPA explained that, based on experience with similar projects, financially feasible alternative configurations and practices could minimize adverse impacts from the discharge of fill material. AR10126–27. The company responded that "its board has set criteria based on risk and return on investment (beyond whether a project may or may not be profitable) and that the alternatives … were not acceptable to [the company] based on these criteria, irrespective of overall profitability." AR10624.

On January 13, 2011, the EPA finalized a Section 404(c) decision ("Final Determination") withdrawing and restricting use of the disposal sites specified by the Spruce Permit in Pigeonroost Branch, Oldhouse Branch, and their tributaries. AR10108. The EPA left the remaining specifications in place "because some of those discharges have already occurred and because the stream resources in … Seng Camp Creek were

9

subject to a higher level of historic and ongoing human disturbance."
AR10114. The agency explained that its action was "a case-specific
determination based on the facts and circumstances presented," namely
"the substantial number of project-specific considerations focusing on
important headwater stream miles in a stressed watershed where a
vast majority of the impacts authorized by the permit had not occurred
because of third-party litigation." AR10201.

The Final Determination rested on two independent grounds. The
EPA found an unacceptable adverse effect on wildlife directly within the
6.6-mile fill footprint, and an additional unacceptable adverse effect on
wildlife downstream. AR10108. It explained that "[a]dditional data and
information, including peer-reviewed scientific studies of the ecoregion,
have become available since permit issuance." AR10110. This additional
information "support[ed] EPA's long-standing concerns about this
project" and justified a rare post-permit Section 404(c) action. *Ibid.*

### C. Procedural history

After the EPA proposed to take action under Section 404(c), Mingo
Logan sued in the U.S. District Court for the District of Columbia and
sought to enjoin the agency from taking further steps. DE1:19. After the

EPA issued the Final Determination, the complaint was amended to challenge that final agency action. DE16:1–47; *see also* 40 C.F.R. § 231.6 ("For purposes of judicial review, a final determination constitutes final agency action under section 404(c) of the Act."). Mingo Logan asserted two types of Administrative Procedure Act ("APA") claims: (1) the EPA did not have authority to act after permit issuance, 5 U.S.C. § 706(2)(C); and (2) the Final Determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).

The parties briefed all these claims in cross-motions for summary judgment, but the district court limited oral argument to the statutory authority question. [11/28/11 Minute Order]. The court then granted summary judgment to Mingo Logan after finding that Section 404(c) did not authorize a post-permit action by the EPA. *Mingo Logan Coal Co., Inc. v. EPA*, 850 F. Supp. 2d 133 (D.D.C. 2012) (*Mingo Logan I*). The court did not consider whether the EPA's action otherwise violated the APA. *See id.* at 151 n.15. The district court's judgment restored the original Spruce Permit, but Mingo Logan agreed not to discharge fill into the contested sites pending further litigation. C.A. # 1375105:2–3.

On appeal, this Court unanimously agreed with the EPA that "the text of section 404(c) does indeed clearly and unambiguously give EPA the power to act post-permit." *Mingo Logan II*, 714 F.3d at 615. This Court reasoned that Section 404(c) "expressly empowers" the EPA to act "'*whenever*' [it] makes a determination that the statutory 'unacceptable adverse effect' will result." *Id.* at 613 (quoting 33 U.S.C. § 1344(c)). This Court also rejected Mingo Logan's position "that EPA's interpretation 'tramples on provisions … that are intended to give permits certainty and finality.'" *Id.* at 614 (citation omitted). This Court also explained that Section 404(p)'s "permit shield" does not prevent the EPA from withdrawing specifications. *Id.* at 615 (interpreting 33 U.S.C. § 1344(p)).

This Court denied Mingo Logan's petition for rehearing en banc, C.A. # 1448493, and the Supreme Court denied the company's petition for a writ of certiorari, *Mingo Logan Coal Co. v. EPA*, 134 S. Ct. 1540 (2014). The case returned to the district court for resolution of the other claims. *Mingo Logan II*, 714 F.3d at 616; *see also* C.A. #1400057:7 (Mingo Logan's appellate brief urging this Court not to consider those claims "in the first instance").

12

The district court invited supplemental summary judgment briefs

on remand, and Mingo Logan presented five "sub-issues" for resolution:

> (a) Whether EPA shows with substantial new information unacceptable adverse effects resulting from direct impacts of discharge from the fill;
>
> (b) Whether section 404(c) gives EPA authority to base its Final Determination on downstream impacts arising from discharges governed by section 402;
>
> (c) Whether section 404(c) authorizes EPA to apply its own water quality standards when determining unacceptable adverse effects downstream;
>
> (d) Whether EPA is required to consider Mingo Logan's mitigation plan when evaluating unacceptable adverse effects; and
>
> (e) Whether EPA is permitted to consider section 404(b)(1) Guidelines when evaluating unacceptable adverse effects.

*Mingo Logan III*, 70 F. Supp. 3d at 161 n.10. Mingo Logan presses sub-

issues (b) and (c) in Part III of its principal brief (Br. 48–58), and Part II

of its brief (Br. 32–47) presents a modified version of sub-issue (a). The

company has forfeited sub-issues (d) and (e) by not presenting them in

its principal brief on appeal. Part I of Mingo Logan's brief (Br. 18–32)

advances a claim that the company did not present to the district court

or the EPA: whether the EPA erred by not accounting for Mingo Logan's

permit compliance history or its allegedly substantial reliance interests.

13

Following a second oral argument, the district court agreed with the EPA on all claims and granted summary judgment to the agency. *Mingo Logan III*, 70 F. Supp. 3d 151. The court rejected Mingo Logan's claim (not pressed on appeal) that the EPA erred by not supporting its post-permit action with substantial new information. *Id.* at 163–68; *see supra* page 6. The court rejected both the premise and the merits of the company's position; it found that the EPA *did* employ substantial new information to justify its decision and that, in any event, there was no such requirement as a matter of law or agency policy. *Id.* at 168 & n.20.

The district court also upheld the EPA's conclusion that discharges authorized by the Spruce Permit would have an unacceptable adverse effect on wildlife within the footprint of the fill. *Mingo Logan III*, 70 F. Supp. 3d at 168–72. That finding was not arbitrary or capricious; it was grounded in a combination of factors: (1) "the sheer size of the proposed fills"; (2) the EPA's growing awareness that "the 'streams are some of the last, rare and important high quality streams in the watershed'"; (3) the fact that these sites "are occupied by such a large number and wide variety of species"; and (4) the adverse effect of the proposed fills on habitat in the greater ecoregion. *Id.* at 169–72 (citations omitted).

The district court could have upheld the EPA's action solely on the basis of impacts within the footprint of the fill. *Mingo Logan III*, 70 F. Supp. 3d at 176 (noting Mingo Logan's concession on this point). But for completeness, the court also probed and upheld the EPA's independent finding that there would be an unacceptable adverse effect on wildlife downstream of the disposal sites. The court rejected Mingo Logan's view that the Act bars the EPA from considering downstream effects. *Id.* at 177–80. Relying on Section 404(c)'s text, structure, and purpose, as well as the EPA's regulations, the court held that the agency's "consideration of downstream effects fell squarely within the realm it was tasked to regulate under section 404(c)," and that the EPA's action in this case "did not invade West Virginia's regulatory sphere." *Id.* at 177, 180 n.31.

The district court also rejected Mingo Logan's argument that an "unacceptable adverse effect" must be tied to water quality standards that West Virginia developed under Section 303 of the Act, 33 U.S.C. § 1313. *Mingo Logan III*, 70 F. Supp. 3d at 180–81. The court explained that Section 404(c) allows the EPA to decide "that merely meeting state water quality standards is insufficient when it is deciding whether section 404 discharges will have unacceptable adverse effects on

15

something other than the water—in this case, wildlife." *Id.* at 180. The court also held that the EPA showed a causal link between discharges at the specified sites and an unacceptable adverse effect downstream of the fill footprint. *Id.* at 181–83. In summary, the district court held that the Final Determination "was reasonable, supported by the record, and based on considerations within EPA's purview." *Id.* at 183.

## STANDARD OF REVIEW

This Court "'review[s] a grant of summary judgment *de novo* applying the same standards as those that govern the district court's determination.'" *Mingo Logan II*, 714 F.3d at 612 (citation omitted). Where a statute is ambiguous, the interpretation of the administering agency "governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009); *see also Mingo Logan II*, 714 F.3d at 612 (interpreting Section 404(c) under *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)). An agency's interpretation of its own regulation governs "unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citation omitted).

16

Mingo Logan asserts that the EPA's Section 404(c) determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary-and-capricious standard of review is "highly deferential"; it "presumes agency action to be valid." *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (en banc). The plaintiff bears the burden of showing that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).

When the issue is whether an agency must (or must not) consider a particular factor when making its decision, it has been recognized that step two of the *Chevron* inquiry may overlap at the margins with the arbitrary-and-capricious framework. *See Judulang v. Holder*, 132 S. Ct. 476, 483 n.7 (2011) ("[U]nder *Chevron* step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance.'") (citation omitted). Put another way, whether the agency "failed to consider an

17

important aspect of the problem," *State Farm*, 463 U.S. at 43, turns on "the problem" that Congress defined in the statute. In this case, Section 404(c) "is quite specific" as to the relevant factors, so "the question is more obviously whether the agency permissibly interpreted the statute" than whether the EPA's action was arbitrary or capricious. *Nat'l Ass'n of Regulatory Utility Comm'rs v. ICC*, 41 F.3d 721, 727 (D.C. Cir. 1994).

An agency's factual findings need only be supported by substantial evidence—"such relevant evidence as a reasonable mind might accept as adequate to support the conclusion.'" *Verizon v. FCC*, 740 F.3d 623, 643 (D.C. Cir. 2014) (citation omitted); *see Dickinson v. Zurko*, 527 U.S. 150, 162, 164 (1999). That is an even more lenient standard than the "clearly erroneous" standard for appellate review of trial court findings. *Stern v. Marshall*, 131 S. Ct. 2594, 2627 (2011). Courts "give an extreme degree of deference to the agency when it 'is evaluating scientific data within its technical expertise.'" *Huls Am., Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) (citation omitted); *see also Ctr. for Biol. Diversity v. EPA*, 749 F.3d 1079, 1087–88 (D.C. Cir. 2014) (collecting cases).

## SUMMARY OF ARGUMENT

1. The Final Determination can be upheld solely on the basis of the EPA's factual finding that discharging Mingo Logan's fill material into these specific disposal sites would have an unacceptable adverse effect on wildlife downstream. The company does not dispute the substance of that finding or the causal link between the discharge of fill material and the unacceptable adverse effect. Rather, Mingo Logan interprets the Act to preclude the EPA from considering downstream effects under Section 404 because such effects are the exclusive province of NPDES permits and water quality standards developed by the States under Section 303 of the Act.

Mingo Logan's convoluted reading of the Act conflicts with its text, structure, and purpose, as well as the EPA's regulatory interpretation, which is entitled to *Chevron* deference. Section 404(c) does not preclude the EPA from considering any downstream effects, whether or not those effects are also pertinent to an NPDES permit for the discharge of non-fill pollutants. Nor does the State's issuance of water quality standards impliedly bar the EPA from preventing unacceptable adverse effects on wildlife that would occur due to shifts in downstream water chemistry.

19

The Final Determination did not establish a "water quality standard"; it answered a different question, namely whether the effect of a particular fill discharge on *wildlife* would be "unacceptable" under Section 404(c).

2. The Final Determination can also be upheld solely on the basis of the EPA's finding that the discharge of Mingo Logan's fill material would have an unacceptable adverse effect on wildlife within the footprint of the fill. The company argues that this finding is subject to "heightened scrutiny" because the EPA made an "implicit finding" before the Spruce Permit issued that the discharges *would not* have unacceptable adverse effects. The agency made no such finding, either officially or informally, but even if it had, any change in course is amply supported by the substantial new information that came to light after permit issuance.

Even under "heightened scrutiny," the EPA's finding is more than adequate. Based in part on new information, the agency reasoned that the magnitude of these fill discharges, combined with the site's unique character and the adverse impacts to a range of wildlife, justified a post-permit Section 404(c) action. Mingo Logan's cursory attempts to contest the science underlying the Final Determination should be rejected.

3. The last issue is whether the EPA unlawfully failed to consider Mingo Logan's record of permit compliance and its allegedly substantial reliance interests. The company forfeited this claim by not presenting it to the agency or the district court, and this Court should therefore not address it. In any event, the claim lacks merit. Neither the statute nor the EPA's regulations require consideration of those factors, and Mingo Logan's "arbitrary-and-capricious" argument cannot survive unmoored from Congress's precise instructions. Moreover, the company has not cited any evidence proving that it made substantial post-permit investments in reliance on discharging fill material into the disposal sites that were affected by the Final Determination. This Court cannot set aside the EPA's decision based on unsupported factual allegations.

## ARGUMENT

### I.  The EPA can premise a Section 404(c) determination on an "unacceptable adverse effect" on wildlife downstream of the footprint of the fill.

Mingo Logan contends (Br. 48-58) that the EPA could not consider downstream effects caused by the fill discharge when deciding whether the discharge would result in an unacceptable adverse effect on wildlife. That "strained interpretation" of Section 404(c) conflicts with the text

21

and purpose of the Act, not to mention the EPA's 36-year-old regulatory interpretation. *Mingo Logan III*, 70 F. Supp. 3d at 178. Mingo Logan also makes the corollary argument that, by considering downstream effects, the EPA usurped the State of West Virginia's power to enact generally applicable standards for water quality within its borders. Here again, the company ignores the language and purpose of Section 404(c) and that provision's role in the Act's overall scheme, which allows the *most* environmentally protective course of action to prevail. Mingo Logan's novel interpretation of Section 404(c) would essentially take part of the express and discrete power that Congress gave to the EPA and transfer it to the States under the guise of promoting federalism.

### A. The EPA's interpretation of Section 404(c) is entitled to *Chevron* deference.

Mingo Logan frames its argument as a freestanding arbitrary-and-capricious claim in an attempt to avoid the conflict with the text of the statute and the EPA's interpretation of the statute as set forth in its regulations. At bottom, the company is contesting the scope of the EPA's authority and the factors that the agency must (or must not) consider before acting under Section 404(c). The EPA's view of the Clean Water Act is owed *Chevron* deference on these issues. *See supra* pages 17–18.

22

An express delegation of rulemaking authority is the clearest sign of Congress's intent that an agency speak with the force of law when it interprets a statute, *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 57 (2011), and the Clean Water Act contains just such a delegation. "Except as otherwise expressly provided," the EPA administers the Act and is authorized to "prescribe such regulations as are necessary to carry out [its] functions." 33 U.S.C. §§ 1251(d), 1361(a). One of those statutorily authorized functions is to prohibit, modify, or withdraw specifications of disposal sites for dredged or fill material. *Id.* § 1344(c). The EPA thus speaks with the force of law when it interprets that provision in regulations and also when it publishes a Section 404(c) determination "after notice and opportunity for public hearings." *Ibid.*

In an earlier phase of this case, Mingo Logan contended that the EPA's interpretation of Section 404 does not merit deference because the Corps administers some aspects of the permit program. But the EPA alone exercises the power granted by Section 404(c), and the EPA's reading of that provision merits *Chevron* deference notwithstanding the Corps' role in issuing permits. *See NRDC, Inc. v. EPA*, 859 F.2d 156, 202 (D.C. Cir. 1988) ("As the agency charged with interpreting the

complicated statutory provisions that comprise the [Clean Water Act],
EPA is entitled to considerable deference in the interpretive process of
making the regulatory machinery work."). On appeal, the company does
not contest *Chevron* deference; it simply ignores the EPA's regulations.

### B. The EPA reasonably interprets Section 404(c) to allow for consideration of downstream effects on wildlife.

Section 404(c) authorizes the EPA to prevent any "unacceptable
adverse effect[s] on municipal water supplies, shellfish beds and fishery
areas (including spawning and breeding areas), wildlife, or recreational
areas." 33 U.S.C. § 1344(c). Beyond listing those four categories of
natural resources, the provision does not restrict the nature or location
of the unacceptable adverse effects that the EPA can consider. *See*
*James City*, 12 F.3d at 1336 ("[The EPA's] authority to veto to protect
the environment is practically unadorned.").

Section 404(c) does not expressly or impliedly preclude the EPA
from looking at downstream effects caused by the discharge of fill. To
the contrary, for example, the text authorizes the EPA to stop adverse
effects on "municipal water supplies," which will nearly always occur

outside the footprint of the discharge.[2] 33 U.S.C. § 1344(c). "And nothing in the text" or in Mingo Logan's brief "indicate[s] that effects on wildlife are to be considered more narrowly" than adverse effects on municipal water supplies. *Mingo Logan III*, 70 F. Supp. 3d at 178; *see also James City*, 12 F.3d at 1336-37 (upholding an EPA post-permit Section 404(c) determination based in part on downstream effects).

Congress's concern about downstream impacts of dredge-and-fill discharges is also reflected in Section 404(b), which directs the EPA, in conjunction with the Corps, to develop the 404(b)(1) Guidelines based on criteria like "the transfer, concentration, and dispersal of pollutants or their byproducts through biological, physical, and chemical processes."

---

[2]     Five days after enacting the Clean Water Act, Congress passed the Marine Protection, Research and Sanctuaries Act of 1972, Pub. L. No. 92-532, 86 Stat. 1052, which authorizes the EPA to prevent the Corps from issuing permits for the dumping of dredged material into ocean waters if the dumping "will result in an unacceptably adverse impact on municipal water supplies, shell-fish beds, wildlife, fisheries (including spawning and breeding areas), or recreational areas." 33 U.S.C. § 1413(d). Because municipal water supplies are not drawn directly from "waters of the open seas," *id.* § 1402(b), the statute plainly allows the EPA to consider indirect effects; and "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes," *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005).

33 U.S.C. § 1343(c)(1)(B) (referenced in 33 U.S.C. § 1344(b)(1)). Having

given the EPA, "in effect, the *final* say on the specified disposal sites,"

*Mingo Logan II*, 714 F.3d at 614, Congress would not have let *the Corps*

consider downstream effects when specifying disposal sites without also

letting *the EPA*—the "'environmental conscience' of the Clean Water

Act," *Section 404(c) Procedures*, 44 Fed. Reg. at 58,081—consider those

effects when using its "broad environmental 'backstop' authority over

the [Corps'] discharge site selection," *Mingo Logan II*, 714 F.3d at 612.

To the extent that Section 404(c) is ambiguous as to whether the

EPA can consider downstream effects, the agency's regulations settle

the question. *Mingo Logan III*, 70 F. Supp. 3d at 178. Those regulations

define an "unacceptable adverse effect" as "an impact on an aquatic or

wetland *ecosystem*," 40 C.F.R. § 231.2(e) (emphasis added), "not simply

impacts within the footprint of the fill," *Mingo Logan III*, 70 F. Supp. 3d

at 178. *See also* 40 C.F.R. § 231.2(e) (including within the definition of

"unacceptable adverse effect" an effect on "ground water," which would

necessarily occur indirectly). "Mingo Logan does not challenge [that]

definition as unreasonable or contrary to the statute." *Mingo Logan III*,

70 F. Supp. 3d at 172.

The regulations further state that "consideration should be given to the relevant portions of the section 404(b)(1) guidelines," which also provide for consideration of downstream effects. 40 C.F.R. § 231.2(e); *see also id.* § 230.10(c) ("[N]o discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States," including "[s]ignificantly adverse effects … on life stages of … wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes"). In fact, the 404(b)(1) Guidelines expressly provide for consideration of "effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill materials." *Id.* § 230.11(h). Mingo Logan no longer argues that the 404(b)(1) Guidelines do not apply here.

The EPA's interpretation of Section 404(c) as covering downstream effects is not merely permissible; it is common sense. "[T]he contents of [dredge-and-fill] material do not remain stationary: the discharge … contaminates water with elements of that material that will move downstream with the natural flow of the current." *Mingo Logan III*, 70

F. Supp. 3d at 179. As long as there is a causal link between the dredge-and-fill discharge and the unacceptable adverse effect (and Mingo Logan no longer disputes the existence of that link in this case), the EPA can act under Section 404(c) to prevent the adverse effect. *Ibid*.

Because the EPA was acting in accordance with its longstanding regulations, the agency did not need to justify its reading of the statute yet again in this Section 404(c) determination. *Contra* Mingo Br. 52, 54. In any event, the EPA did explain why the agency construes Section 404(c) to cover downstream effects. *E.g.*, AR10488–91, 10545.

## C. The EPA's consideration of downstream effects under Section 404(c) does not supplant or interfere with State-issued NPDES permits or water quality standards.

Mingo Logan conceded to the district court that the EPA may "look at wildlife downstream as long as there is not an intervening regulatory decision that is made by the state." *Mingo Logan III*, 70 F. Supp. 3d at 177 (citation omitted). The decision that allegedly "intervened" here was an NPDES permit that West Virginia issued to authorize the discharge of non-fill pollutants traceable to the Spruce Mine. *Id.* at 157-58, 178. Mingo Logan's apparent view is that the EPA was not allowed to look at downstream effects in this case because (i) the EPA has allowed West

28

Virginia to issue NPDES permits, *see id.* at 155; and (ii) in addition to a Section 404 permit, Mingo Logan needed an NPDES permit here for the discharge of non-fill pollutants traceable to the Spruce Mine. That the scope of the EPA's *statutory authority* could turn on such happenstance is itself evidence that the company's reading of the Act is wrong. Plus, Mingo Logan does not explain how, under its crabbed interpretation of Section 404, the Corps could still consider downstream impacts caused by the discharge of dredge-and-fill material.[3]

Mingo Logan's NPDES permit does not authorize the discharge of fill material because "if the discharge is fill, the discharger must seek a § 404 permit." *Coeur Alaska*, 557 U.S. at 276. The company's NPDES permit allows the discharge of non-fill pollutants from "sediment ponds" into waters protected by the Act. The sediment ponds "treat water from various parts of the mine," including (but not limited to) the water that passes through the fill material. *Mingo Logan III*, 70 F. Supp. 3d at 177.

---

[3]     Mingo Logan has never argued that the Corps erred by considering downstream effects of discharges authorized by the Spruce Permit. *See, e.g.*, AR13142 (Corps study of the "potential impacts to surface waters downstream of the proposed project (indirect impacts)"); AR13278 ("The study area … includes the project area and the areas downstream of the mine water discharges into the primary receiving streams ….").

As the district court explained, the Final Determination did not nullify Mingo Logan's NPDES permit in law or in practice. *Id.* at 178 & n.28; *see also* AR10573.

Nor did the EPA's action interfere with water quality standards that West Virginia promulgated under Section 303 of the Act, 33 U.S.C. § 1313. Those general standards apply to discharges of both fill and non-fill pollutants,[4] 33 C.F.R. § 122.4; 40 C.F.R. § 230.10(b), and they mark a floor, rather than a ceiling, for environmental protection, *Mingo Logan III*, 70 F. Supp. 3d at 181; AR10571–72. Just as States may impose strict limitations and stop discharges that do not comply with them, 33 U.S.C. §§ 1341(a), 1370, the EPA may act under Section 404(c) to prevent discharges that have "unacceptable adverse effects," independent of any other standard that might also govern those discharges, *id.* § 1344(c); *see also* 40 C.F.R. § 131.21(d) (characterizing

---

[4]     *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261 (2009), does not support Mingo Logan's sweeping contention (Br. 51) that "standards applicable to [NPDES] discharges do not apply to 404 discharges." There, the Supreme Court deferred to EPA guidance stating that "new source performance standards" issued under Section 306 of the Act, 33 U.S.C. § 1316, do not apply to Section 404 permits, 557 U.S. at 277–91. The Court's analysis of the statutory language was specific to Section 306 and cannot be extrapolated to every standard or limitation that might apply to a discharge of pollutants. *Id.* at 278–82.

State water quality standards as "minimum standards" for discharges of dredge-and-fill material); AR10440.

The Final Determination clarifies that the EPA's "unacceptable adverse effect" determination is not premised on an actual or predicted violation of West Virginia's water quality standards. AR10153, 10299–300. Rather, the EPA's decision is based, in part, on adverse changes in water chemistry that have a corresponding adverse effect on aquatic wildlife and other water-dependent wildlife. AR10324, 10332. The EPA's consideration of changes in water chemistry, as it relates to wildlife, does not amount to an "ad hoc" water quality standard. Mingo Br. 57; *see also* AR10327, 10584–85. And again, nothing in Section 404(c) or elsewhere in the Act confines the EPA to considering adverse effects that do not in any way implicate water quality concerns.

While Congress "str[uck] a deliberate and careful balance between the powers and responsibilities assumed by the federal government and those remaining with the States," Mingo Br. 49, Congress also gave the EPA *exclusive* authority to decide whether the discharge of fill material would have an unacceptable adverse effect on specific natural resources. The EPA's site-specific and discharge-specific authority is not curbed by

generally applicable water quality standards, nor is the EPA restricted to ensuring consistency with those standards. AR10329, 10545.

Lastly, Mingo Logan suggests that the APA requires a heightened standard of review in this case due to "federalism concerns." Mingo Br. 49 (citing a dissent in *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 908 (2000)). No such concern exists where (as here) Congress has been clear about the split of authority between the federal and state governments. But even if Congress had not been so explicit, Mingo Logan's protests about federalism are irrelevant to "judicial review of authorized agency action" absent a constitutional challenge, which the company has not pressed. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

In summary, Mingo Logan has not carried its burden to show that the EPA's interpretation of Section 404(c)—which permits consideration of downstream effects—is an impermissible reading of the statute. That the downstream effect in this instance would occur partly through shifts in water chemistry does not mean that the EPA promulgated an ad hoc water quality standard. This Court can uphold the Final Determination solely on the basis of the EPA's "downstream" finding, and as discussed further below, Mingo Logan does not otherwise challenge that finding.

## II.  The EPA's finding that an unacceptable adverse effect on wildlife would occur within the footprint of the fill was supported by substantial evidence, including substantial new information that came to light after permit issuance.

Mingo Logan asserts (Br. 32-47) that the EPA did not adequately explain its "unacceptable adverse effect" findings. This Court need not consider this claim if it agrees with the EPA on the previous claim, but in any case, the agency adequately explained the Final Determination and supported its findings with substantial evidence in the record.[5]

### A.  Mingo Logan's challenge to the "downstream" finding merely restates the statutory argument refuted in Part I.

The EPA's factual finding with regard to wildlife downstream "is lawful and could serve as an independent basis to uphold the Final Determination." *Mingo Logan III*, 70 F. Supp. 3d at 176. Mingo Logan alleges one error in that finding (Br. 44) : "Congress has assigned the States the responsibility for regulating water quality within their

---

[5]    Mingo Logan no longer argues that the Act or EPA policy required the agency to base the Final Determination on new information arising after permit issuance. *See Mingo Logan III*, 70 F. Supp. 3d at 163–68 (rejecting this argument). The company references this argument only in a footnote, Mingo Br. 34 n.6, which does not suffice to preserve it for appeal, *see CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014). In any event, substantial new information supports the Final Determination. *Mingo Logan III*, 70 F. Supp. 3d at 168 n.20; *see infra* pages 45–46.

33

borders under section 402, and EPA may not properly take those matters into account under Section 404." But that simply restates the claim that we have already addressed and refuted. Thus, if this Court rejects the company's "strained" legal interpretation of the Clean Water Act, it need not go further. *Mingo Logan III*, 70 F. Supp. 3d at 178.

To be sure, Mingo Logan also quarrels with the standard of review that the district court applied, but that is not enough. The company has to identify a substantive flaw in the EPA's factual finding; absent such a flaw, the finding would be upheld under *any* standard of review. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Any effort by Mingo Logan to cure this defect in its reply brief will come too late, *see Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001), so this Court should sustain the Final Determination solely on the basis of the EPA's "downstream" finding.

## B.  The EPA's action is not subject to "heightened scrutiny."

Mingo Logan relies on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) (*Fox*)—a case not cited in its district court pleadings—to contend that the EPA's Final Determination is subject to "heightened scrutiny" under the APA. Mingo Br. 32–43. That argument is misplaced

for three reasons. First, *Fox* stands for the opposite proposition—that the APA *does not* impose a stricter "standard of review" depending on the context of the agency action. *Fox*, 556 U.S. at 514. Second, the EPA's Final Determination was not a "rescission[ ] of prior action." *Id.* at 515. Third, even if the agency's action could be so characterized, the EPA did not need to "provide a more detailed justification" for its action because it did not "contradict" earlier "factual findings." *Ibid.* Indeed, the EPA did not make any factual findings at all before the Final Determination.

1. *Fox* rejected the argument that "all agency change [is] subjected to more searching review." 556 U.S. at 514. The APA speaks of "no such heightened standard," and the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *Id.* at 513-14. The Supreme Court was unanimous on this point. *See id.* at 550 (Breyer, J., dissenting). Thus, Mingo Logan's contention (Br. 43) that the EPA's action "mandates more robust scrutiny" is misplaced.

2. *Fox* did go on to state that a "rescission[] of prior action" could, in certain circumstances, "require[] 'a reasoned analysis for the change beyond that which may be required when an agency *does not act* in the first instance.'" 556 U.S. at 514–15 (quoting *State Farm*, 463 U.S. at 42).

Mingo Logan contends (Br. __) that the Final Determination "rescinded" a "prior action"; according to the company, the "prior action" in this case was the EPA's *inaction* before the Spruce Permit issued. The district court thoroughly and correctly explained why Mingo Logan is wrong:

> First, nothing in section 404(c) requires EPA to issue a formal declaration that it will or will not exercise its veto authority prior to the issuance of a permit, and the Corps is not required to wait for EPA to announce a decision to decline to exercise its section 404(c) authority before it may issue a permit under section 404(a). Instead, section 404(c) contains permissive, discretionary language … that … demonstrates that EPA's failure to block Mingo Logan's permit application … cannot be characterized as a prior agreement or finding by EPA that the permitted discharges would not have unacceptable adverse effects. Declining to take a position when nothing requires the agency to take a position cannot serve as the foundation for an argument that the agency changed course when it took an official position for the first time.

*Mingo Logan III*, 70 F. Supp. 3d at 166 (citations omitted). *Fox* was very careful to differentiate between "failures to act" and "rescissions of prior action," 556 U.S. at 514–15, and this Court should reject Mingo Logan's attempt to muddle that distinction.

Mingo Logan recasts the EPA's failure to act under Section 404(c) as an "implicit finding" that discharging fill material into the specified disposal sites *would not* have an unacceptable adverse effect on wildlife. Mingo Br. 38. But Section 404(c) is permissive, not mandatory, and the

36

EPA's inaction is not necessarily premised on a "negative" unacceptable adverse effect determination. *Mingo Logan III*, 70 F. Supp. 3d at 167; *cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (reciting the "complicated balancing of a number of factors" that inform "an agency decision not to enforce").[6] And even if the EPA had made an *implicit* finding, such a finding would not have been "on the books." *Fox*, 556 U.S. at 515. Thus, no "change of official agency position" could have occurred in this case. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996); *see also Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 58 (D.C. Cir. 2015).

Mingo Logan's "smoking gun" is a half-sentence in an e-mail that a mid-level EPA official sent his Corps counterpart in 2006. After reciting unresolved concerns about the proposed discharges of fill material, the e-mail stated without explanation that "we have no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint."

---

[6] This Court need not decide whether the EPA's failure to act under Section 404(c) is "committed to agency discretion by law" and therefore unreviewable by a court. 5 U.S.C. § 701(a)(2). It is enough to note that the universe of considerations that inform agency inaction is broader than the factual findings that underlie affirmative agency action. *Cf. Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 4 (D.C. Cir. 1987) (explaining that "an agency's refusal to institute a rulemaking" involves "a high level of agency expertise and coordination in setting priorities").

AR23085 (e-mail from the Director, Office of Environmental Programs, Environmental Assessment, and Innovation to the Huntington District Project Manager). That statement did not "establish a binding agency [position]"; not only was it "too informal," it was conveyed by a subordinate official who was not delegated authority to bind the EPA. *Smiley*, 517 U.S. at 743; *see also* 40 C.F.R. § 231.6 ("*[T]he Administrator shall make a final determination ….*") (emphasis added); AR10114 n.3 (explaining that "the Assistant Administrator for Water" has been delegated authority "to make final decisions under § 404(c)"). The Final Determination was not a "change of course" for the EPA, *Fox*, 556 U.S. at 515; it was the *only* time that the agency's Section 404(c) decision maker was presented with the opportunity to determine whether an unacceptable adverse effect would occur as a result of these discharges.

Mingo Logan argues (Br. 42) that "EPA's failure to veto a proposed permit amounts to final agency action subject to judicial review under the APA." But challenges to agency inaction are limited to cases where "an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). The company does not contend that Section 404(c) creates a mandatory

duty, and the district court decision that it cites—*Alliance to Save the Mattaponi v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 1 (D.D.C. 2007)—supplied no coherent rationale for transforming agency inaction into "final agency action" in the face of permissive statutory language.

3. Even assuming that the Final Determination could be construed as a "rescission[] of prior action," no "more detailed justification" would have been needed for the Final Determination because it did not "rest[] upon factual findings that contradict[ed]" earlier findings made by the agency.[7] *Fox*, 556 U.S. at 515. As just explained, the EPA had not made any "factual findings" under Section 404(c) prior to permit issuance.

And even if this Court construed the EPA's inaction as an implicit factual finding, there would still be no conflict between that finding and the Final Determination. The Final Determination rested on a record that was materially different, and there is nothing untoward about new information eventually tipping the balance in favor of action that might not have been appropriate at an earlier stage. *See Mingo Logan III*, 70 F. Supp. 3d at 159; *see also* 33 U.S.C. § 1344(h)(1)(A)(iii)(III) (explaining

---

[7]    Mingo Logan's distinct claim that the EPA failed to address its alleged "reliance interests" is discussed in Part III, *infra* pages 46–59.

that a Section 404 permit "can be terminated or modified" based on

changed circumstances); *cf.* 33 C.F.R. § 325.7(a) (same). Here, "scientific

knowledge … expand[ed] and evolve[d], building upon itself to form an

understanding that may not have been fully developed before." *Mingo*

*Logan III*, 70 F. Supp. 3d at 168 n.20. Thus, even if the EPA had made

an implicit "negative" determination, a reversal of course in the Final

Determination would not have been arbitrary or capricious. *See, e.g.*,

*Nat'l Ass'n of Broadcasters v. FCC*, 569 F.3d 416, 425 (D.C. Cir. 2009).

In short, *Fox* demands nothing more than "substantial evidence" to

support the EPA's finding that the discharging fill material would have

unacceptable adverse effects on wildlife. *See supra* page 18. And even if

"a more detailed justification is required," *Fox*, 556 U.S. at 515, the EPA

provided that justification, as we now explain.

**C. Substantial evidence supported the EPA's finding that the fill discharge would have an unacceptable adverse effect on wildlife within the footprint of the fill.**

As noted earlier, Mingo Logan does not contest the EPA's finding

that an unacceptable adverse effect on wildlife would occur downstream

of the fill other than to argue (Br. 44) that "EPA may not properly take

[downstream water quality] into account under section 404." Part I of

this brief, *supra* pages 21–32, explained why that argument fails, and because the downstream finding was an independent basis for the Final Determination, this Court need not consider the EPA's finding of an unacceptable adverse effect on wildlife within the footprint of the fill. Alternatively, this Court may uphold the Final Determination solely on the basis of the EPA's factual conclusion that an unacceptable adverse effect would occur within the 6.6-mile footprint of the fill material.

The EPA's regulatory definition of "unacceptable adverse effect" encompasses a "significant loss of or damage to … wildlife habitat." 40 C.F.R. § 231.2(e). The term "unacceptable" in Section 404(c) "refers to the significance of the adverse effect—e.g. is it a large impact and is it one that the aquatic and wetland ecosystem cannot afford." *Section 404(c) Procedures*, 44 Fed. Reg. at 58,078. Here, the EPA found that such an effect would occur in the waters within the footprint of the fill. AR10115. Mingo Logan asserts (Br. 46–47) that its proposed discharge is "routine" for a dredge-and-fill project, but the record shows otherwise.

The "sheer size of the proposed fills," *Mingo Logan III*, 70 F. Supp. 3d at 169, differentiates this case from the "thousands of other permits that authorize fills in streams," Mingo Br. 46; *see* AR10117 (noting that

the project "is one of the largest mountaintop mining projects ever authorized in West Virginia"). Apart from being "large," the discharge was "one that the aquatic and wetland ecosystem [could not] afford." *Section 404(c) Procedures*, 44 Fed. Reg. at 58,078; *see also* AR10152. Mingo Logan does not dispute that the discharge would "destr[oy] … 6.6 miles of high quality stream habitat in a watershed where there is little remaining high quality stream habitat." AR10149. The importance of these specific streams was not fully appreciated by scientists until after the Spruce Permit issued. AR10122.

The scope and location of this particular discharge "adequately explain why EPA is adopting a differen[t] stance here than it might take in another case." *Mingo Logan III*, 70 F. Supp. 3d at 170–71. "[E]ven if the burial of wildlife may be deemed to be acceptable in some other location, the eradication of wildlife within the 6.6 miles of affected streams here was unacceptable because Pigeonroost Branch and Oldhouse Branch are occupied by such a large number and wide variety of species, and the 'streams are some of the last, rare and important high quality streams in the watershed.'" *Id.* at 169.

42

The EPA identified adverse impacts to four types of wildlife within the fill footprint—macroinvertebrates, fish, salamanders, and water-dependent birds. Section 404(c) does not limit the EPA to considering impacts to "rare" or "endangered" species, Mingo Br. 46, particularly when those species, like macroinvertebrates, "are at the base of the faunal food web" and thus play a crucial role in the survival of other species, AR10149. Mingo Logan asserts (Br. 46–47) that the species of fish discussed in the Final Determination do not reside within the fill footprint, but the EPA identified studies that indicate otherwise, and "this is precisely the type of dispute" on which a reviewing court should defer to the agency. *Mingo Logan III*, 70 F. Supp. 3d at 171; *see* AR10140, 10150–51, 10457–58, 10460.

As for salamanders, Mingo Logan incorrectly argues (Br. 46) that the EPA did not "quantify[ ] the number of salamanders that would be affected." The agency "estimate[d] salamander density [within the fill footprint] … at approximately 5–6 individuals per square meter," A10150, for a total of 250,000 salamanders along the length of the fill, AR10465–66. While the EPA was aware prior to permit issuance that salamanders living within the footprint of the fill would be destroyed, it

43

had been assumed that species populating these waters would return,

sometimes years later, to reestablish a community. But new research

postdating the Spruce Permit called that assumption into question and

heightened the EPA's concern that the types of salamanders present

before the fill would not repopulate the area. AR10150.

Finally, with respect to the Louisiana Waterthrush, Mingo Logan

argues (Br. 46) that "there is no coherent justification" for finding an

unacceptable adverse impact because those species have not been

spotted within the fill footprint. The EPA reasonably concluded that the

Spruce Permit discharges would eliminate habitat for this water-

dependent bird, which "requires forested headwater streams for

foraging on insects and nesting," is likely to breed in the project area,

and is particularly susceptible to the impacts of mountaintop mining

and valley fills. AR10151, AR10357, AR010475–76, AR010480–81.

Mingo Logan contends (Br. 47) that the mining site does not contain

habitat preferred by the Waterthrush, but the EPA and the U.S. Fish

and Wildlife Service disagreed. Agency scientists "continue[d] to believe

… that past selective logging in some parts of the project area would not

preclude use of the site" by migratory birds. AR010474. The EPA also

disagreed with Mingo Logan's allegation that the fill footprint contains only "intermittent and ephemeral" streams. AR010188.

In the face of these conflicting views of the science, the EPA was entitled to rely on the opinions of its own experts and of those at the U.S. Fish and Wildlife Service. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Regardless, the Final Determination's validity does not turn on the EPA's assessment of impacts to the Louisiana Waterthrush; "even putting that species aside, EPA points to significant impacts upon a wide range of species that are known to inhabit the area." *Mingo Logan III*, 70 F. Supp. 3d at 171 n.23.

Because the EPA did not rest the Final Determination on findings that contradicted prior factual findings, the agency was not required to provide a "more detailed justification" for its decision. *Fox*, 556 U.S. at 515. In any event, the Final Determination supplied such a justification in the form of new information that came to the EPA's attention after permit issuance. AR10282–83. At the time it acted under Section 404(c), the agency had a better understanding of the ecological importance of Pigeonroost Branch, Oldhouse Branch, and their tributaries. AR10122. The Final Determination also relied on new information indicating that

45

mitigation required by the Section 404 permit would not adequately compensate for the loss of aquatic functions, resulting in a net adverse effect on a range of wildlife. AR10187, 10190–91, 10234–36, 10241–45, 10583. The EPA had also become aware of new information regarding salamanders and water-dependent birds and the adverse effect that the discharges would have on those species. AR10150–51. Perhaps most importantly, the Final Determination used data from Mingo Logan's discharge of fill material into the Seng Camp Creek watershed to inform its scientific conclusions. AR10147, 10582. Collectively, this new information supplied the "'reasoned analysis for the change,'" *Fox*, 556 U.S. at 514 (quoting *State Farm*, 463 U.S. at 42), that would have been necessary if (contrary to fact) the EPA had made inconsistent factual findings at an earlier date.

### III.  Mingo Logan's reliance/compliance claim is forfeited, and it also lacks merit.

Mingo Logan's remaining claim (Br. 18–32) is that the EPA failed to adequately address the company's track record of compliance with its permit and its allegedly substantial reliance interests. The company did not present this claim to either the EPA or the district court, meaning

46

that the claim is forfeited and this Court should not address it. In any case, the EPA was not required to consider Mingo Logan's compliance history or its unsupported allegations of reliance interests.

### A. Mingo Logan has forfeited this claim by not raising it before the EPA or the district court.

"It is well established that issues not raised in comments before the agency are waived and this Court will not consider them.… [T]here is a near absolute bar against raising new issues—factual or legal—on appeal in the administrative context." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) (citations omitted). Parties contesting agency action must "'forcefully present' their arguments 'at the time appropriate under agency practice,' or else waive the right to raise those arguments on appeal." *Village of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 655 (D.C. Cir. 2011) (citations and brackets omitted). A similar principle applies to issues that were not presented to district courts. *See Flynn v. Comm'r*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001).

The company's reliance/compliance claim is thus doubly forfeited. The EPA's Section 404(c) proceedings were "adversarial" from Mingo Logan's perspective and gave the company ample opportunity to object to an "unacceptable adverse effect" finding. *See Sims v. Apfel*, 530 U.S.

47

103, 110 (2000). Mingo Logan seized that opportunity, submitting hundreds of pages of comments opposing action under Section 404(c). AR8047–53, 10662–66. Those comments said nothing about a requirement that the EPA address Mingo Logan's compliance history or reliance interests.

The company then pleaded 14 separate APA claims in this suit, none of which alleged that the EPA was required to consider reliance interests or compliance history. DE16:31–46. Nor did Mingo Logan make a reliance/compliance argument in its summary judgment briefs, or even on remand, when the company opted to *narrow* the district court's focus to five discrete "sub-issues." *See supra* page 14. And in the previous appeal to this Court, Mingo Logan did everything it could to avoid resolution of its arbitrary-and-capricious claims. C.A. #1400057:7.

To be sure, Mingo Logan argued to the EPA and the district court (and argues again on appeal, Mingo Br. 32–42) that the agency must supply a more robust justification for a post-permit action. The district court relied on *Fox* to hold that no "heightened standard of scrutiny" was required in this instance. *Mingo Logan III*, 70 F. Supp. 3d at 166–67. However, the court did not address (because Mingo Logan did not

present) the distinct claim that the EPA had to consider specific extra-statutory factors—compliance history and reliance interests. On appeal, Mingo Logan bases that new claim on *Fox* after failing to cite that case or its progeny in any prior pleading. The district court's citation of *Fox* to reject one of Mingo Logan's claims did not give the company license to introduce a new and separate claim on appeal, let alone a claim that is premised on a different passage from the Supreme Court's opinion.

There are no "exceptional circumstances" in this case that would warrant consideration of Mingo Logan's forfeited claim. *Flynn*, 269 F.3d at 1069. The company does not identify "uncertainty in the law" or an "intervening change in the law," nor does it allege that this is a "novel, important, and recurring question[] of federal law." *Ibid.* Mingo Logan's hyperbole aside, the record does not show that the company's new claim "is either sufficiently important or fraught with sufficient risk of a miscarriage of justice to warrant deviation from [this Court's] general refusal to address issues raised for the first time on appeal." *Ibid.*

In the event that this Court decides to entertain the company's claim in the first instance, we will now show why it lacks merit.

## B. Section 404(c) does not require the EPA to address reliance interests or permit compliance history.

The issue presented—*whether*, as opposed to *how*, the EPA must consider certain factors when exercising its Section 404(c) authority—is a question of statutory construction,[8] *see supra* page 22, and the answer to that question begins with the text of the statute. Congress specified one, and only one, factor that the EPA must address when making its decision: whether specification of a disposal site "will have an unacceptable adverse effect" on one of four listed natural resources. 33 U.S.C. § 1344(c). "Read naturally," that "discrete criterion does not encompass" a permittee's reliance interests or its compliance record. *Michigan v. EPA*, 135 S. Ct. 2699, 2709 (2015). Mingo Logan contends that the EPA must consider those two factors, but they are "*both* so indirectly related to" natural resource effects "*and* so full of potential for canceling the conclusions drawn from" natural resource effects that

---

[8]     Mingo Logan relies (Br. 29–30) on *AEP Texas North Co. v. Surface Transportation Board*, 609 F.3d 432 (D.C. Cir. 2010), which addressed whether an agency "*misapplied* [a] retroactivity analysis," *id.* at 438 (emphasis added), not whether it had to conduct such an analysis in the first instance. *AEP* is also distinguishable because the EPA's Final Determination had no "retroactive" effect. *See supra* page 6; *cf. Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 269–71 (D.C. Cir. 1993).

Congress "surely would have expressly … mentioned" them if it had meant for them to be considered. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 469 (2001); *cf*. Mingo Br. 25 (arguing that "these [two] considerations could trump later-emerging environmental concerns").

As a result of the legislative compromise underlying Section 404, Congress "granted EPA a broad *environmental* 'backstop' authority over the [Corps'] discharge site selection." *Mingo Logan II*, 714 F.3d at 612 (emphasis added); *see supra* pages 4–5. The Corps specifies disposal sites based on a panoply of factors that may include "economic impact," 33 U.S.C. § 1344(b)(2), but Congress focused the EPA on environmental factors alone, "consistent with the missions assigned to it throughout the Clean Water Act." *James City*, 12 F.3d at 1336. Therefore, this Court should join the Fourth Circuit in upholding an EPA's post-permit action based "solely on environmental considerations." *Id.* at 1332.

Mingo Logan eschews Section 404(c)'s text and legislative history in favor of the same peripheral indicia of congressional intent that this Court already examined and rejected as irrelevant to Section 404(c). The company relies (Br. 22) on Section 404(p), a provision stating that compliance with a Section 404 permit "shall be deemed compliance"

with the Act for purposes of enforcement actions brought by the EPA and private citizens. 33 U.S.C. § 1344(p). But when the EPA acts under Section 404(c), the permit is, "amended so that [future] discharges at the previously specified disposal sites" will not be valid. *Mingo Logan II*, 714 F.3d at 615. Having failed to persuade this Court that the *language* of Section 404(p) "implicitly limit[s] section 404(c)'s scope," *ibid.*, Mingo Logan is now trying to import the *purpose* of Section 404(p) into Section 404(c). "[T]hat battle has already been fought and lost." *Mingo Logan III*, 70 F. Supp. 3d at 164 n.13.

Section 404(p) does provide "finality" and "certainty" to permittees in two respects. First, no enforcement action can be brought against the permittee for earlier discharges into specified sites made in accordance with a validly issued permit. *See Mingo Logan II*, 714 F.3d at 615 n.5; *cf. NLRB v. Bell Aerospace Co. Div. of Textron Inc.*, 416 U.S. 267, 295 (1974) ("[T]his is not a case in which some new liability is sought to be imposed on individuals for past actions which were taken in good faith reliance on [agency] pronouncements."). Second, permit holders are "insulate[d] … from changes in various regulations during the period of a permit" that could otherwise invalidate discharges sanctioned by the

permit. *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977) (discussing the role of 33 U.S.C. § 1342(k), an analogous "permit shield" provision for NPDES permits); *see also* H.R. Rep. No. 92-911, at 128. These permittee protections answer Mingo Logan's protest (Br. 25) that Section 404(c) vitiates finality and certainty.[9]

Relatedly, Mingo Logan relies on a passage in a floor statement by Senator Edmund Muskie that describes the "three essential elements" of the Clean Water Act as "uniformity, finality, and enforceability." 118 Cong. Reg. at 33,693. "[P]utting to one side that this was the statement of a single member of Congress," *Mingo Logan II*, 714 F.3d at 616, his pithy summary of the Act's goals does not suggest that the EPA must consider extra-statutory, non-environmental factors to decide whether discharging pollutants at a site "will have an unacceptable adverse effect" on particular categories of natural resources, 33 U.S.C. § 1344(c).

---

[9]     Mingo Logan states that the EPA previously "emphasized that 'any attempt to apply limitations or standards which were not in effect at the time of permit issuance constitutes unauthorized overreaching by the permit issuing authority.'" Mingo Br. 25 (quoting *National Pollutant Discharge Elimination System; Revision of Regulations*, 44 Fed. Reg. 32,854, 32,869 (June 7, 1979)). That statement, made in the context of the NPDES program rather than the Section 404 program, reflected the views of "commenters," and, in any event, it referred only to changes in generally applicable standards not at issue here. 44 Fed. Reg. at 32,869.

To the extent that there is ambiguity in the phrase "unacceptable adverse effect," the EPA resolved that ambiguity in its regulations. 40 C.F.R. § 231.2(e); *see also Section 404(c) Procedures*, 44 Fed. Reg. at 58,078. Mingo Logan has already admitted to this Court that the EPA's regulations "do not consider" a permittee's "compliance" history or any "investments made in reliance on the permit." C.A. #1400057:69. Those regulations are entitled to *Chevron* deference. *See supra* pages 22–23.

Mingo Logan ignores the EPA's regulations in favor of regulations that it likes better—the Corps' regulations for suspension, modification, or revocation of permits. 33 C.F.R. § 325.7. Those regulations are not specific to Section 404 permits, nor were they derived from a statutory command. *See id.* §§ 320.2, 325.1. Most importantly, regulations issued by the Corps do not bind the EPA, and it is understandable that the agencies' distinct statutory roles lead to distinct regulatory approaches. Mingo Logan's preference for symmetry does not trump asymmetrical statutes and regulations. *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 296 (2011).

## C. The APA did not require the EPA to address compliance history or reliance interests in this case.

Mingo Logan does not frame its argument in *Chevron* terms, even though (as discussed above) its brief is peppered with secondary tools of statutory construction. To the extent that its aims can be discerned, the company appears to be making a freestanding argument, based on "the APA's ban on arbitrary and capricious action," that compliance history and reliance interests must be addressed as a matter of "[b]lackletter administrative law," independent of statutory language. Mingo Br. 19. But whether an agency must address specific factors depends on its statutory mandate, which is sometimes "capacious[ ]" and other times "discrete." *Michigan*, 135 S. Ct. at 2707, 2709. Section 404(c) fits in the latter category. Its specific instruction to consider environmental effects reflects Congress's balance of competing policy considerations in Section 404, and that balance is not subject to revision by the courts.

To support the proposition that a permittee's compliance history must be addressed under Section 404(c), Mingo Logan relies on little beyond the Corps regulations discussed above, which are irrelevant to the EPA's decisionmaking process. The company also tries to shoehorn compliance history into the "reliance interests" box, Mingo Br. 20 n.2,

but the shoe does not fit. The reason that Mingo Logan complied with the Spruce Permit was not an expectation that the EPA would not act under Section 404(c); the company complied with the Spruce Permit because it would otherwise be breaking the law. If Mingo Logan had discharged fill not in compliance with its permit, the EPA could have addressed that problem without using Section 404(c) by bringing an action for enforcement of the Clean Water Act. *See* 33 U.S.C. §1344(n).

Mingo Logan bases its reliance-interest argument on *Fox*, but that case does not stand for the principle that agencies must always account for reliance interests. *Fox* explained that a more detailed explanation for agency action may be required when a "prior policy has engendered serious reliance interests that must be taken into account,"[10] but as discussed earlier, the Final Determination was not a "rescission[] of

---

[10]    The Supreme Court did not define a "serious" reliance interest, but the authority cited in *Fox*—*Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735 (1996)—itself relied on decisions that dealt with civil or criminal fines and other penalties, which are not implicated here. *Bell Aerospace*, 416 U.S. at 295; *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 673–74 (1973); *see also Fox*, 556 U.S. at 518 ("[T]he agency's decision not to impose any forfeiture or other sanction precludes any argument that it is arbitrarily punishing parties without notice …."). Because the Final Determination did not impose new legal consequences for past conduct, *Mingo Logan II*, 714 F.3d at 615 n.5, it did not operate "retroactively."

prior action." *Fox*, 556 U.S. at 515. This case is thus distinguishable from *Mobil Communications Corp. v. FCC*, 77 F.3d 1399 (1996), on which Mingo Logan relies (Br. 30–31). There, the agency affirmatively and authoritatively stated "that [the plaintiff] would not be required to pay" for a communications license, and then later "reversed itself." *Id.* at 224. No such "reversal" occurred here. *See supra* pages 35–39.

Mingo Logan's assertion (Br. 22) that the Spruce Permit conveyed "property rights" is belied by the permit itself, which states that it "does not grant any property rights." AR25764; *see also* 33 C.F.R. §320.4(g) ("Authorization of work by [the Corps] does not convey a property right …."); *United States v. Rands*, 389 U.S. 121, 123 (1967) (explaining that navigable waters are "'the public property of the nation,'" regulation of which "is not an invasion of any private property rights in the stream or the lands underlying it") (citation omitted). The company's suggestion (Br. 27) that it lacked notice of the EPA's post-permit authority is also untenable. The agency clearly announced its position on that issue in 1979, and it has taken post-permit actions (albeit quite rarely) in the years since. *See Mingo Logan II*, 714 F.3d at 613 n.3; *see also James City*, 12 F.3d 1330 (sustaining a post-permit Section 404(c) action).

Mingo Logan has a final problem—the record does not support its allegation (Br. 26) that the Final Determination defeated "substantial reliance interests." Pre-permit investments could not have been made *in reliance on* the permit; and as for post-permit investments, the company can only muster one sentence in the (original) complaint that alluded to money spent "preparing the site and commencing operations." DE1:10 (cited at Mingo Br. 26). Mingo Logan does not cite record evidence to support this allegation, but regardless, it does not get the company where it wants to go. That Mingo Logan started mining *somewhere* does not demonstrate that it made substantial post-permit investments in reliance on the ability to discharge fill material into the *specific disposal sites* later withdrawn by the EPA. *See* AR10561.

In fact, Mingo Logan's complaint indicates the opposite. As a result of the litigation initiated a week after the permit issued, the company did not commence operations in Pigeonroost Branch, Oldhouse Branch, or their tributaries, nor is there evidence that it tried to mine coal that would be disposed of in those sites. DE1:10; AR10121, 10561; *see supra* pages 7–8. Mingo Logan had limited its operations to the disposal sites specified in the Seng Camp Creek watershed, which were not affected

by the Final Determination. AR10108 n.1 ("EPA is not withdrawing specification of those waters, in part because some of those discharges have already occurred and … one valley fill is partially constructed.").The EPA was also entitled to rely on its own experts, whose technical review indicated that the Spruce Mine could be reconfigured to recover much of the coal without discharging fill into those disposal sites. AR10407, 43057–60; *see also Marsh*, 490 U.S. at 378. Mingo Logan has not offered any basis in the record upon which this Court could conclude that the EPA's action "effectively nullif[ied]" the Spruce Permit or rendered the company's post-permit investments "worthless." Mingo Br. 27, 29.

The lack of record support for Mingo Logan's argument is further reason for this Court to follow its usual practice and decline to hear a forfeited claim. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). The EPA's action cannot be set aside based on something that was not properly presented to the agency.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

59

Respectfully submitted,

*/s/ Matthew Littleton*
MATTHEW LITTLETON
Attorney, Appellate Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7415
Washington, DC 20044
Tel: (202) 514-4010
Fax: (202) 353-1873
matthew.littleton@usdoj.gov

October 9, 2015
90-5-1-4-18793

**STATUTORY AND REGULATORY ADDENDUM**

The pertinent portions of 33 U.S.C. § 1344 are reproduced in the addendum to Mingo Logan's principal brief. The following regulation is also pertinent to the issues on appeal:

**40 C.F.R. § 231.2.  Definitions.**

…

(e) *Unacceptable adverse effect* means impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas. In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines (40 CFR part 230).

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Excepting the portions of the brief described in Fed. R. App. P. 32(a)(7)(B)(iii), the brief contains 12,725 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in Century Schoolbook, 14-point.

*/s/ Matthew Littleton*
MATTHEW LITTLETON
Attorney, Appellate Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7415
Washington, DC 20044
Tel: (202) 514-4010
Fax: (202) 353-1873
matthew.littleton@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2015, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Matthew Littleton*
MATTHEW LITTLETON
Attorney, Appellate Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7415
Washington, DC 20044
Tel: (202) 514-4010
Fax: (202) 353-1873
matthew.littleton@usdoj.gov